IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01339-WYD-KLM

CHARLES E. PEA,

    Plaintiff,

v.

ELAVON, INC. and U.S. BANK NATIONAL ASSOCIATION d/b/a U.S. BANK,

    Defendants.

---

**FINDINGS OF FACT
AND
CONCLUSIONS OF LAW**

---

I.     <u>INTRODUCTION</u>

Plaintiff Charles Pea ("Pea") asserts two employment related claims in this matter: (1) a Title VII and 42 U.S.C. § 1981 race discrimination claim and (2) an age discrimination claim under the Age Discrimination in Employment Act ("ADEA"). Pea claims that Defendants Elavon and U.S. Bank ("Elavon") discriminated against him in connection with the termination of his employment.

Shortly before a jury trial was set to commence, the parties filed a Joint Statement of Withdrawal of Jury Demand (ECF No. 71). Thus, a trial to the Court was held on August 21-24, 2017. As the finder of fact, I have thoroughly and carefully weighed the evidence presented at trial, assessed the credibility of the witnesses, and considered the parties' arguments, and for reasons stated on the record on August 24, 2017 and set forth below, I enter the following findings of fact and conclusions of law

pursuant to Fed. R. Civ. P. 52.

II.     FINDINGS OF FACT

1.      U.S. Bank is a diversified financial services company that offers banking and financial solutions to its customers. Elavon is a subsidiary of U.S. Bank and part of U.S. Bank Payment services. It provides a credit card processing network and payment processing solutions for merchants including many healthcare providers.

2.      U.S. Bank and Elavon maintain a Code of Ethics and Business Conduct which sets forth the Company's discrimination policy. The policy states that "[w]e do not tolerate harassment or discrimination based on race, religion, color, creed, age, sex, national origin or ancestry, sexual orientation (including gender expression or identity), genetic information, disability, veteran status, citizenship status, marital status or other factors that are protected by law." (Ex. 22). One of the Company's core values is diversity. "At U.S. Bank, diversity and inclusion means intentionally engaging and respecting the talents, perspectives and uniqueness in all of US to drive business success." (Ex. 22).

3.      Elavon operates a call center in Englewood, Colorado. Between 2012 and 2016, approximately 20% of the call center employees were African American individuals. At that same time frame, approximately 50% of the call center employees were over 40 years of age.

4.      In July, 2012, Pea applied for an employment position with Elavon after attending a job fair at Arapahoe Works, where he met Elavon employees, Tyrone Velasquez and Susan Wills. After attending the job fair, Pea filled out an online job

application.

5. Pea's date of birth is March 25, 1961 and he is African American.

6. Pea then interviewed for the job with Elavon employees, Tyrone Velasquez and Velasquez's supervisor, Terese Brozovich.

7. Velasquez testified that he met approximately 35 people at the job fair, but he was impressed with Pea's energy and excitement about working at Elavon, so Velasquez recommended to human resources that Pea be hired. Pea was offered a position as Operations Manager 3. This was an at-will position.

8. When Velasquez hired Pea, he knew Pea was African American and he believed Plaintiff to be close in age to himself. Velasquez was 51 years old at the time and also African American.

9. On August 20, 2012, Pea began his employment with Elavon.

10. Velasquez worked as Elavon's Director of Premier Customer Service and supervised Pea during Pea's entire employment with Elavon.

11. As an Operations Manager, Pea's responsibilities included managing the call center's achievement of targets and goals, developing and supervising a team of representatives and leads, increasing quality customer service, strategic planning, scheduling and driving the team to meet goals and objectives, creating a culture that supports the mission of the company, ensuring compliance with all policies and procedures, and recruiting, developing, and retaining the best people.

12. Pea was also responsible for understanding the products for which he and his team provided assistance, including credit card terminals and the Company's health

care product, holding weekly conference calls with a third-party vendor and Company employees that work with the Healthcare customers, and handling emergency technical issues when he was the manager on call.

13. After approximately four months on the job, Velasquez gave Pea his first performance review. The review period covered the start of Pea's employment on August 20, 2012 through December 31, 2012.

14. The performance reviews are based on a 1-5 scale with 1 being "Exceptional," and 5 being "Not Effective." A numeric rating of 2 is "Highly Effective," 3 is "Solid Performance," and 4 is "Needs Improvement." Pea rated himself a 4 (Needs Improvement) in three significant categories. His overall rating based on his self-evaluation was a 3.5. Pea indicated that he needed improvement in the areas of managing the call center, proper use of available tools and resources, and drive results orientation. (Ex. 3).

15. Velasquez testified that he wanted to be fair to Pea, given that he was new to a job with a rather steep learning curve. Thus, Velasquez rated Pea higher than Pea rated himself, giving Pea an overall rating of 3.22, which is between Solid Performance and Needs Improvement. Velasquez specifically noted that Pea needed to focus on managing his scheduled hours and attendance to ensure proper coverage during the morning hours; ensure that his staff is being appropriately recognized and awarded for their work performance and achievements; improve his relationships and take more initiative in regards to his staff and the products they support; collaborate more with his peers on process improvements; and challenging and growing his team. Velasquez

also wanted Pea to provide a more positive influence within the department, provide timely Weekly/Monthly reporting and improvements, and manage timely outage notifications.

16. Significantly, Velasquez testified that following this initial performance review, Pea's job performance worsened.

17. For example, Pea was required to provide Velasquez weekly and monthly reports that Velasquez would then use to put together his own reports for his supervisor. Pea himself admitted that he failed to timely submit these reports to Velasquez on numerous occasions. On January 23, 2013, Velasquez sent Pea an email, informing Pea that his weekly report was late. Pea responded by stating that he had prepared the reports but forgot to send them and that he needed to start double checking himself. However, on March 10, 2013, Velasquez emailed Pea about another late monthly report. Pea responded stating that "I cannot give you a good reason for missing your deadline." (Ex. A7).

18. Velasquez testified credibly as to the importance of the weekly and monthly reports being submitted on time. The weekly reports are submitted to Velasquez by all of his managers, and then Velasquez uses that information to compile his own report to be sent to upper management. I find that this was one of Pea's important job duties, and his failure to submit these reports on time placed Elavon at a disadvantage.

19. In March, 2013, Velasquez asked Pea to draft an announcement regarding one of Pea's new employees. Pea missed the deadline, and Velasquez had to send

Plaintiff a reminder email asking for the announcement again. This is another example where Pea failed to fulfill one of his job duties.

20. Velasquez testified that Pea's job performance continued to decline. From June, 2013 through August, 2013, Velasquez had regular one-on-one meetings with Pea where Velasquez communicated with Pea about various performance issues and concerns. Velasquez also tasked Pea with several managerial assignments, including setting up a time line for another employee, Linda Cordova, to be trained to take healthcare calls and to work to reduce the defect list. Pea never completed these tasks. I find that these one-on-one meetings should have informed Pea that his work was still deficient, but that Velasquez was continuing to work with Pea in an effort to help him succeed.

21. Between March and August, 2013, Pea arrived to work late or left the premises during the course of the day, sometimes during company outages. Pea continued to miss a variety of deadlines set for him by Velasquez, turned in inadequate work product, and failed to communicate adequately with Velasquez regarding significant events involving his team members or the status of projects assigned to him by Velasquez.

22. On August 9, 2013, Velasquez gave Pea a Written Warning/Performance Improvement Plan ("PIP") regarding Plaintiff's performance.

23. In the PIP, Velasquez critiqued Pea's work performance in a number of different areas including the following:

• Leaving the office unmanaged during system outages, specifically major

outages on July 29 and July 30, 2013, and failing to notify management when his schedule varied from his standard hours.

• Failing to timely comply with a deadline set by Velasquez to put together a plan and time line for one of the employees from a different team to be trained to assist Pea's team.

• Failing to appropriately manage the defect list, including determining which defects still needed to be addressed and accurately updating Velasquez on how the defects were being addressed or removed from the list.

• Demonstrating poor communication by not informing Velasquez of issues with Pea's team such as sleeping on the job, resignation from employment, and engaging in disruptive behavior.

24. The PIP set forth Velasquez's expectations of Pea going forward. Velasquez requested better lines of communication, follow through and prompt response times to deadlines, escalation of issues when appropriate, and keeping management appraised of all escalated issues. Additionally, Pea was explicitly instructed to complete tasks and projects within the assigned deadlines.

25. The PIP further provided: "Upon successful completion of this notice you will be expected to maintain satisfactory performance in all areas. If you fail to do so, you will be subject to further disciplinary action up to and including termination without additional warning periods." (Ex. 11). On August 9, 2013, Velasquez met with Pea to discuss the PIP in detail.

26. As I stated on the record on August 24, 2017, I find that Velasquez placed Pea on the PIP for a positive, rather than a negative, purpose. The PIP was implemented because Velasquez had legitimately observed deficiencies in Pea's job performance and wanted to give him ample notification of those deficiencies with the

hope that Pea's performance would improve. I also find that Pea had a difficult time understanding the full scope of his job, and Velasquez's criticisms were fair and legitimate. While Pea testified that he did not believe that the PIP accurately reflected his work performance, this merely shows a difference of opinion, not evidence of discrimination.

27. There was ample evidence presented at trial about the July 29-30, 2013 outage referenced in the PIP. On July 29, 2013, Pea was aware that there was an outage actively occurring, and then elected to leave the premises for nearly two hours to take his truck to the mechanic for non-emergency repairs. On July 30, 2013, Pea again left during the outage to take a personal phone call in the parking lot. As I stated on the record in great detail, I find that Pea exercised poor judgment when he left work during the ongoing outage, thus, Velasquez's resulting criticisms were valid and legitimate.

28. With regard to the defect list, as I stated in great detail on the record, I find that there was likely a miscommunication between Pea and Velasquez, and that Pea failed to fully understand Velasquez's expectations on how he should work to reduce the list and update Velasquez on his progress or lack thereof. As to Pea's failure to devise a plan and time line for one of the employees from a different team to be trained to assist Pea's team, there was testimony that Pea never completed this task. Thus, I find that Velasquez's resulting criticisms were supported and nondiscriminatory.

29. Finally, I find evidentiary support for Velasquez's criticisms of Pea's poor communication and cannot say that these were pretextual or intentionally false.

30. After Velasquez provided Pea with the PIP, both Velasquez and Pea

testified that they met approximately every week to discuss Pea's performance. Velasquez was often critical of Pea's performance and documented the performance problems.

31. After the PIP, Pea's poor job performance continued. On September 22, 2013, the call center experienced an outage that impacted one of Elavon's largest clients, Hilton Hotels. A call center agent contacted Pea as he was the on-call manager at the time, and informed him that 10-15 properties were unable to process credit card transactions. Pea reached out to another manager to ask what to do. While there is some dispute as to what the other manager told Pea, ultimately, Pea did not send a notification to the customer. Velasquez testified that it was Pea's responsibility to send an outage notification to the customer in this specific situation, but that Pea failed to do so.

32. In late September, 2013, Velasquez instructed Pea to volunteer one or two of his employees to assist with testing a new Healthcare product. Instead, Pea ignored this request and had his entire team sign up for the test. Velasquez testified that this left no one available to take health care calls. After this incident, Velasquez noted that "Charles completely ignored my request and sent an email to the Product manager shortly after our conversation requesting to have his entire team added as testers." (Ex. 14).

33. In October, 2013, Pea missed the October 18 deadline set by Velasquez to provide him with a draft nomination form for a member of Pea's team who was to be considered for a significant company award, the Pinnacle Award. Velasquez gave Pea

the task in late September and, on October 1st, specifically reminded him again regarding the October 18 deadline. Pea did not provide a completed nomination form until October 28, 2013. While Pea testified that he could not recall the exact deadline he was to submit the nomination form, I find credible Velasquez's testimony and Teresa Brozovich's testimony that Pea missed this deadline.

34. Velasquez testified that on October 31, 2013, he requested that Pea implement an email form for Pea's team to send as an automated acknowledgment when a customer would contact the team online, seeking assistance. Velasquez asked that Pea provide him with the process and procedure by November 6, 2013. Pea did not meet the deadline or provide any update by that date. Velasquez again asked Pea about the status in their one-on-one meeting. In response, Pea stated that he was unable to get this task accomplished because he wanted to add an escalation process to the procedure, which was not what Velasquez had instructed Pea to do. Pea admitted that he never completed this automated email message task during his employment.

35. Based on these continuing performance problems, Velasquez testified that he had originally intended to place Pea on another PIP in November, 2013, but after the following two events occurred, Velasquez decided to terminate Pea's employment.

36. First, Velasquez requested that Pea provide his evaluation for his team members by November 15, 2013. Pea asked for an extension of this deadline, which Velasquez agreed to. However, Pea did not have the evaluations completed by the extended deadline. When Pea did provide the evaluations to Velasquez, Velasquez

noticed that the evaluations were similar, used the exact same wording in places, and contained pronoun errors, likely due to copying and pasting from one evaluation to the other. Second, Pea allowed his team-lead to turn in a completely blank self-evaluation. Velasquez informed Pea that this was not acceptable and that Pea needed to have the employee fill out the self-evaluation portion of the review. Both Velasquez and Terese Brozovich credibly testified as to the importance of the annual employee review process and the fact that untimeliness and sloppiness can impact employee promotions, bonuses, benefits, and other financial compensation.

37. Velasquez detailed many of Pea's performance issues in a written memorandum dated November 22, 2013.

38. Velasquez made the recommendation to Human Resources that Pea's employment be terminated due to poor performance.

39. On November 22, 2013, Velasquez and Shelly Geist, a Human Resources representative, met with Pea. Velasquez informed Pea that he was being terminated and referenced Pea's various performance problems summarized in the written memorandum. Pea did not claim that any of Velasquez's criticisms were false and made no complaints of discrimination.

40. Velasquez is African American and was born on November 27, 1961, making him 51 years old when he terminated Pea's employment.

41. After his termination, on December 30, 2013, Pea wrote a letter to Richard Davis, the Chairman of the Board, CEO and President of U.S. Bank, in which Pea complained that his termination was "wrongful." (Ex. 15). In this letter, however,

Plaintiff did not mention or complain of any type of discrimination.

42. In response, Human Resources determined that Pea's termination was justified, and sent Pea a letter stating that his job performance did not meet Elavon's performance expectations. Thus, "[t]he termination decision stands." (Ex. A40).

43. During his employment, Pea never raised any complaints of discrimination or harassment to anyone at Elavon, including Human Resources or Velasquez.

44. In March, 2014, Pea filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race, age, retaliation, and hostile work environment.

45. While Tommie Shaw, a former Elavon employee, testified that he perceived race discrimination at Elavon in the form of him being treated as a "token" African American employee, I cannot connect this testimony to any potential illegal action taken against Pea since Pea's termination was justified due to his poor performance.

46. In December, 2014 and January, 2015, Velasquez was investigated and ultimately terminated from his employment for violating U.S. Bank policies with respect to cash deposits. As I stated on the record on August 24, 2017, I find that this event is not connected to the circumstances surrounding Pea's termination, and does not impact or diminish Velasquez's credibility. In fact, both Shelly Geist and Terese Brozovich testified that they trusted Velasquez's management decisions and leadership. Also, Terese Brozovich and Bruce Emberley (a former Elavon employee who was supervised by Velasquez) both testified credibly that Velasquez treated his managers consistently

and held them to the same performance standards.

III. <u>CONCLUSIONS OF LAW</u>

1. Pea claims that Elavon unlawfully terminated his employment based on his race under Title VII and 42 U.S.C. § 1981and his age under the ADEA.

2. Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees and applicants for employment on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1).

3. 42 U.S.C. § 1981 prohibits racial discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a), (b).

4. "The ADEA states that it is unlawful for an employer 'to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . .'" *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000) (quoting 29 U.S.C. § 623(a)(1)).

5. Where, as here, plaintiff attempts to prove intentional discrimination by indirect evidence, the court employs the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973).

> Under the *McDonnell Douglas* framework, the plaintiff must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. Once the plaintiff has established a prima facie case, the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its employment action. If the defendant

makes this showing, the plaintiff must then show that the defendant's justification is pretextual. Importantly, the three-part *McDonnell Douglas* burden-shifting analysis is limited to the summary judgment context. Once there has been a full trial on the merits, the sequential analytical model adopted from *McDonnell Douglas* ... drops out and we are left with the single overarching issue whether plaintiff adduced sufficient evidence to warrant a jury's determination that adverse employment action was taken against the plaintiff because of his or her protected status.

*Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) (internal citations and quotations omitted); *see Messina v. Kroblin Transportation Systems, Inc.*, 903 F.2d 1306, 1308 (10th Cir. 1990) (stating in an ADEA case, that "the presumption and burdens inherent in the *McDonnell Douglas* formulation drop out of consideration when the case is submitted to the jury on the merits.")

6. "[A]lthough the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (internal citations and quotations omitted).

7. Thus, to prevail on a claim of race discrimination, plaintiff bears the ultimate burden of proving by a preponderance of the evidence that his race was a motivating factor in the defendant's actions. *Elmore v. Capstan, Inc.*, 58 F.3d 525, 529 (10th Cir. 1995) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

8. To prevail on a claim of age discrimination, plaintiff bears the ultimate burden of proving by a preponderance of the evidence that his employer would not have

terminated his employment but for the plaintiff's age.  This standard does not require the plaintiff to show that age was the sole motivating factor in the employment decision.  Instead, an employer may be held liable under the ADEA even if other factors contributed to the employer taking the adverse action, as long as age was the factor that made the difference.  *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176-78 (2009); *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277-78 (10th Cir. 2010).

9. Here, Pea is an African American who is over 40 years of age.

10. Elavon terminated Pea's employment.

11. Pea claims that Elavon's stated reasons for his termination are pretextual.  If I find pretext, I may, but am not required to, infer that race and/or age was a factor that made a difference in the employer's decision to terminate Pea's employment. *Reeves*, 530 U.S. at 146-149; *Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1241 (10th Cir. 2002).

12. Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)).

13. Generally, a plaintiff shows pretext in one of three ways: "(1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing

the action to be taken by the defendant under the circumstances ...; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff." *Plotke v. White*, 405 F.3d 1092, 1102-03 (10th Cir. 2005).

14. The Tenth Circuit has instructed that no matter what theory of pretext the plaintiff asserts, the Court's "role isn't to ask whether the employer's decision was 'wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs.'" *Johnson*, 594 F.3d at 1211 (alternations in original) (quoting *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004)). "Evidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 948 (10th Cir. 2011) (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169-70 (10th Cir. 2007)). The Court's role "is to prevent intentional discriminatory ... practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

15. Here, my role as the finder of fact is to weigh all the evidence and assess the credibility of the witnesses in order to determine whether Pea was the victim of intentional discrimination based on his race and/or age at the hands of Elavon.

16. There is no dispute that Pea is an African American who was over 40

years of age at the time of his employment with Elavon. Further, Pea was subjected to an adverse employment action when Elavon terminated his employment.

17. As set forth above, Elavon presented ample evidence that Pea was terminated for a legitimate nondiscriminatory reason—continued poor job performance. Pea, on the other hand, characterizes Elavon's actions and criticisms of his job performance as intentionally false and not worthy of belief. Pea believes that he was targeted and treated unfairly by Velasquez and held to a higher standard than other Elavon employees. Pea disagreed with Velasquez's critiques and discipline of his job performance, including being placed on the PIP and ultimately fired, and does not believe that his work performance was accurately reported.

18. While I believe that Pea's testimony was largely credible and sincere, Pea's views show a difference of opinion, not evidence of discrimination. An employee's disagreement with his performance "obviously does not prove discriminatory intent." *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir. 1994).

19. Although Pea testified that he was a good performer, "[i]t is the perception of the decision maker which is relevant, not plaintiff's perception of [him]self." *Pippin v. Burlington Resources Oil and Gas Co.*, 440 F.3d 1186, 1195 (10th Cir. 2006).

20. It is clear from the entirety of the evidence presented at trial that Velasquez, as Pea's supervisor, believed Pea did not have the skill set to perform in his managerial position as evidenced by the many instances of substandard performance set forth above. The relevant inquiry is not whether Velasquez's reasons were wise, fair, or correct, but whether Velasquez honestly believed his reasons and acted in good

faith on those beliefs. Velasquez credibly testified, along with presenting supporting evidence, that he believed that Pea was incapable of performing his job and acted on that belief when he terminated Pea.

21. Pea simply has not proven by a preponderance of the evidence that Elavon's stated exercise of business judgment in evaluating his performance was actually a cover or pretext for racial or age bias. During his tenure at Elavon, Pea never complained about race or age discrimination nor did he mention discrimination in his post-termination letter to the U.S. Bank CEO. In fact, Pea never mentioned any sort of discrimination until he filed his EEOC charge in March of 2014.

22. Further, the Tenth Circuit has articulated a strong inference that the employer's stated reasons for acting against the employee are not pretextual where the employee was hired and fired by the same person within a relatively short time span. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1182 (10th Cir. 2006) (internal citation omitted) (employee terminated 10 months after being hired, evidence of pretext did not dispel the same actor inference). Here, Velasquez made the decision to both to hire and fire Pea in a period of 15 months. There was simply no evidence presented that Velasquez developed some discriminatory motivation during that period of time.

23. In conclusion, having carefully weighed the evidence, Pea failed to prove by a preponderance of the evidence that his race was a motivating factor in Elavon's decision to terminate his employment.

24. Further, Pea failed to prove by a preponderance of the evidence that Elavon would not have terminated his employment but for Pea's age.

25. There is simply insufficient evidence to support these claims along with any claim of pretext.

IV. CONCLUSION

Based the above findings of fact and conclusions of law, Defendants did not discriminate against Plaintiff when they terminated his employment. Accordingly, it is

ORDERED that judgment shall enter in favor of Defendants and against Plaintiff on both his race discrimination claim and his age discrimination claim. It is

FURTHER ORDERED that this matter is **DISMISSED WITH PREJUDICE**. It is

FURTHER ORDERED that Defendants are awarded their costs to be taxed by the clerk of the court in the time and manner prescribed in Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated: September 6, 2017

BY THE COURT:

*/s/ Wiley Y. Daniel*
Wiley Y. Daniel
Senior United States District Judge